```
1                   BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,       .
                                     .   Case Number 21-cr-86
4              Plaintiff,            .
                                     .
5        vs.                         .
                                     .   Washington, D.C.
6    ROBERT SANFORD,                 .   April 11, 2023
                                     .   10:17 a.m.
7              Defendant.            .
     - - - - - - - - - - - - - - - -

8

9                   TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      JANANI IYENGAR, AUSA
                                 United States Attorney's Office
14                               601 D Street Northwest
                                 Washington, D.C. 20579
15

16   For the Defendant:         ANDREW M. STEWART, ESQ.
                                 Dennis Stewart & Krischer, PLLC
17                               2111 Wilson Boulevard
                                 Eighth Floor
18                               Arlington, Virginia 22201

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  This is Criminal Action 21-86, United States versus Robert Sanford.

Counsel, please step forward to the podium and state your appearances for the record.

MS. IYENGAR:  Good morning, Your Honor.  Janani Iyengar for the United States.

THE COURT:  Good morning.

MR. STEWART:  Good morning, Your Honor.  Andrew Stewart on behalf of Mr. Sanford.

THE COURT:  Good morning.  Good morning, Mr. Sanford.

So we are here for sentencing.  And I've read everything that's been submitted by everyone.  I've gone back and read the plea papers and the Statement of Facts and all of that.  I've read the plea papers.  I've read the presentence investigation report prepared by the Probation Office and their recommendation, the government's sentencing memorandum and the defendant's sentencing memorandum.

And this morning, or yesterday, I guess, there was a filing relating to restitution by the government.

I've also read a lot of case law on the question of serious bodily injury.  And I've read the many letters that have been submitted by friends and family and former colleagues of Mr. Sanford.

1    There are a number of things that are on the agenda, I

2 think, that I'm aware of, but I will hear from you about how you

3 want to proceed.

4    Normally, I would start by announcing my guideline

5 calculations.  In this case -- and for those that are here who

6 are not lawyers, the way this works in the federal system is

7 that there are federal sentencing guidelines which have been

8 issued by the Sentencing Commission and revised over the years.

9 Congress passes laws.  They set maximum penalties.  But the

10 guidelines suggest a range of months for a sentence based on

11 experience over the years, decades now, and trying to avoid

12 sentencing disparities from case to case in similar cases.

13    The guidelines are only advisory.  So I have full authority

14 to vary downward or, on rare occasion, upward from the

15 guidelines.

16    The problem in this case is there's a dispute about a

17 significant guideline.  And so as I understand the dispute,

18 everyone is in agreement that this case, Mr. Sanford's case,

19 given what he pled to, which was Count 2 of the indictment --

20 Count 2 is assaulting, resisting, or impeding certain officers

21 using a dangerous weapon, and that dangerous weapon being a fire

22 extinguisher, in violation of 18 United States Code

23 Section 111(a)(1) and 111(b).

24    So I think everyone agrees, the Probation Office,

25 government, and the defense, that we start with guideline 2A2.2,

aggravated assault, and the base offense level for aggravated assault is 14.

Because a dangerous weapon was used, four levels are added under 2A2.2(b)(2)(B), use of a dangerous weapon.

Because a conviction is under 111(b), the more serious felony provision of the statute, two more levels are added.

And because the victim was a government employee and the crime was motivated by his status as a government employee, guideline 3A1.2 applies.

And under 3A1.2, it says if a victim was a government officer or employee and the offense of conviction was motivated by such statute, add three levels. But if the offense was an offense against a person under Chapter 2, Part A, of the guidelines, and this is such a offense, as pled to and agreed to, instead of adding three levels, then the guidelines tell me to add six levels.

So -- and you all can correct me if I'm wrong. Everyone agrees to that.

In addition, because Mr. Sanford pled guilty in this case, he is entitled to at least a two-level downward adjustment, and the government has agreed to the third level, which is in their discretion, under 3E1.1 of the guidelines for acceptance of responsibility. Everyone agrees to that.

So the question as to which the government has the burden of proof by a preponderance of the evidence is whether

2A2.2(b)(3)(A) applies.  And under 2A2.2(b)(3)(A), under

aggravated assault, if the victim has sustained bodily injury,

then the offense level is increased according to the seriousness

of that injury.

And in this case, the government is arguing for 2A2.2 --

2A2.2(b)(3)(A), bodily injury, not serious bodily injury, not

permanent or life-threatening injury, but bodily injury.  And

the definition of bodily injury is found in application note to

Section 1B1.1 of the guidelines.  Application Note 1 defines

bodily injury as "any significant injury, e.g., an injury that

is painful and obvious or is of a type for which medical

attention ordinarily would be sought."

And so I think that the factual and legal question that's

open under the guidelines is whether the government can

demonstrate that that enhancement applies.

So as I understand, that's the main issue we have to

discuss that is not agreed to other than normal allocution, in

which I will hear from counsel and anybody else anybody wants me

to hear from.

And then the other question is whether the government wants

me to impose restitution today or to wait for more information,

but that's just easy, because under the law, I can wait up to 90

days.

So that's a long predicate to where I think we are.  I'd

like to hear from counsel as to whether they think I've got it

1    right so far as to where things stand and also how you want to
2    proceed.
3                    MS. IYENGAR:  Yes, Your Honor.
4        I guess I will start with the bodily injury enhancement and
5    make my argument on that and see if Mr. Stewart wants to respond
6    to that.
7                    THE COURT:  Could you draw the microphone a little
8    closer?
9                    MS. IYENGAR:  Sure.  Sorry.  Is that any better?
10   Okay.
11                   THE COURT:  You are shorter than some lawyers.  I
12   don't know if you've noticed.
13                   MS. IYENGAR:  It's been brought to my attention, Your
14   Honor, yes.
15       So in terms of the bodily injury enhancement, the
16   government believes that it has met its burden of showing by a
17   preponderance that this enhancement should apply.
18       As the Court just noted, the definition for bodily injury
19   for this particular enhancement is an injury that is painful and
20   obvious or is of the type for which medical attention would
21   ordinarily be sought.
22       So I guess first of all, I just wanted to start with the
23   defendant's actual conduct, which I think informs whether this
24   is bodily injury under the guidelines.
25       The defendant threw a fire extinguisher, and the Court

1    could see from the screenshots that were a part of the

2    government's sentencing memorandum the distance that he was

3    standing at from the group of officers that the fire

4    extinguisher ultimately struck.  Based on the video, it appears

5    to be about a 15- to 20-foot distance that he threw the fire

6    extinguisher.

7        This is -- I think for anyone who has ever picked up a fire

8    extinguisher, it's a heavy metal object, and you can see in the

9    video that the fire extinguisher strikes the officers in the

10   head, and it's essentially landing on top of a group of officers

11   that's one level below where the defendant is standing.  So

12   that's why it strikes the officers in the head.

13       We're aware of at least two officers that were identified

14   as having been struck by that fire extinguisher, the officers

15   with the initials W.Y. and sergeant with the initials P.R.

16       So for Sergeant P.R., he reported to the government that as

17   a result of being struck, as a result of this specific incident,

18   not the just general chaos of that day but this specific

19   incident, he had a bump on his head, as well as swelling on his

20   head.  So that alone is an injury that is painful and obvious

21   and would qualify under the guidelines as being -- as bodily

22   injury.

23       Although he did not seek medical attention for that, that

24   is the type of injury -- especially given the location of it, it

25   was on his head, it is the type of injury that a person would

ordinarily seek medical attention for.

THE COURT:  Let me ask you a question.  As I remember what I've read, one of the officers was wearing a helmet and one was not.

Which was Sergeant P.R.?

MS. IYENGAR:  Sergeant P.R. was not wearing a helmet.

So for Officer W.Y., as we reported in our sentencing memorandum, he had a headache and ultimately did go to the hospital.  And we provided the Court yesterday with the medical records supporting that, and then we also provided a copy to defense counsel as well.

So again, this was -- because he was struck in the head with a fire extinguisher, it led him to have a headache, and he actually did seek medical attention for the injury to him.  This again qualifies as bodily injury under the guidelines, because it was something that a person would ordinarily seek medical attention for, because he was struck in the head with a fire extinguisher.

THE COURT:  Does the medical attention -- it doesn't say "medical treatment."  It says "medical attention."  As I understand it, based on what I've read and what you submitted as a part of the restitution filing today or yesterday, he went to the hospital sort of as a precautionary matter, and they did a CT scan, an X-ray, and then they released him; right?

MS. IYENGAR:  Yes, Your Honor.

1          THE COURT:  It was that same day.  Did he then go back
2     to work?
3          MS. IYENGAR:  He did not return to work the next day,
4     but I believe he returned to work the following week is my
5     understanding.
6          THE COURT:  So he did not return to work that day?
7          MS. IYENGAR:  No, he did not return to work that day.
8          THE COURT:  So either that day or the next day.
9          MS. IYENGAR:  Yes.
10          THE COURT:  Do you know whether he did not go to work
11     the next day because of this or because it was a day off or
12     because a lot of officers who were involved in January 6 were
13     told you need a rest?
14          MS. IYENGAR:  So I don't -- I don't want to sort of
15     misrepresent what the situation was to the Court.  My
16     understanding from speaking to the officer was that he had
17     essentially worked the entire day on January 6.  So after this
18     incident happened, he continued to work, and he only went to the
19     hospital after his tour of duty was done for the day.
20          So he did not work the next day.  I can't say that it's
21     because of this injury or because he was told not to work, but I
22     do know that he did not return back to work until the following
23     week.
24          THE COURT:  Got it.  All right.
25          So this is Docket 55, filed yesterday, and if I'm reading

1     the medical records correctly, so on January 6, he goes to the

2     emergency room, and they did an X-ray, took an X-ray --

3                MS. IYENGAR:  Yes.

4                THE COURT:  -- and a CT head without contrast.

5                MS. IYENGAR:  Yes.

6                THE COURT:  Now -- okay.  Got it.  Okay.

7                MS. IYENGAR:  So that's the basis for our request that

8     this enhancement apply in this case.  I understand that, you

9     know, he was released the same day.  He didn't really need any

10    subsequent treatment beyond just getting the X-ray and the CT

11    scan.  But that's not what's required under the guidelines here.

12    What is required is that this is the kind of injury that

13    somebody would have gotten some sort of medical attention for,

14    even if it was just to make sure that there was not any more

15    serious injury or something that needed further treatment.

16         And that's exactly what officer -- what the officer did

17    here.  So we are asking that this guideline apply based on that.

18                THE COURT:  Okay.  Thank you.

19         Mr. Stewart?

20                MR. STEWART:  Thank you, Your Honor.

21                THE COURT:  And you can take off your mask when you

22    speak.  It will be easier for all of us.

23                MR. STEWART:  Yes, sir.

24         Your Honor, with regard to the definition of "bodily

25    injury," I think it's important to back up to the point of the

sentence before the examples that are given, and that is that

bodily injury is defined as "any significant injury" as opposed

to "any injury."

     After that, we have the examples of something that is

painful, I believe is the word, or obvious or painful and

obvious or requires some sort of medical attention.

     Based on the code of 18 U.S.C. 111(a) and (b), we see that

there is a spectrum of conduct and injury that's described

within the code.  We have anywhere from misdemeanor assault

where there's no touching to a felony where there is conduct --

or contact, to more serious felonies where there is a weapon

that's used or there's more significant injury that's caused.

     And then we have guideline enhancements, many of which

Mr. Sanford stipulated to or agreed to, and also this bodily

injury enhancement, all designed to categorize these injuries or

contacts that are made with law enforcement in order to put an

individual's conduct onto a spectrum.

     And our argument, in essence, is that this falls in between

the area of some sort of contact with law enforcement and

significant injury.  This, we're arguing or suggesting to the

Court, is not significant injury where, as in the case of

Officer P.R., who was not the officer wearing the helmet --

          THE COURT:  Say again.

          MR. STEWART:  P.R. is not the officer wearing a

helmet, and so he -- so no helmet on.  He's struck with the fire

1    extinguisher.  We suggested to the Court that the fire

2    extinguisher was empty, just to inform the force that this may

3    have been making contact with the officer's head.  But P.R.

4    suffers a lump on his head.

5        It's important that at the time, he does not, you know,

6    leave the line of officers or the group of officers to seek

7    medical attention.  He, in essence, turns to see the direction

8    from which the object came from that struck him in the back of

9    the head.

10           THE COURT:  Why don't you pull the microphone up a bit

11   or stand closer to it.

12           MR. STEWART:  Usually, my voice carries a little bit

13   better.

14       So in essence, he turns to see the -- where this object

15   came from, basically looking over his shoulder, and then returns

16   his focus to the crowd.

17       So at least in that moment, yes, there was contact made

18   with the officer, but again, our argument is that it was not

19   significant.

20       Then we have Officer W.Y.  He was wearing a helmet, same

21   circumstance.  He also remained on the scene, maintained his

22   focus on the crowd in front of him, later experienced a headache

23   and sought precautionary medical care.

24       I don't think that a headache is something where someone

25   would normally seek medical attention.  I think that this is --

there's a distinction between that term of art and an individual
who is just experiencing a headache and going to seek some sort
of precautionary treatment.

But the essence, I think, really boils down to my first
argument, that there's a spectrum that's created by the code and
then the guidelines in this case.  And our argument is that this
particular contact, though it caused a lump on the officer's
head and a headache for the other officer, does not rise to the
level of significant injury that would require an enhancement.

Thank you, Your Honor.

THE COURT:  I just want to mention to both counsel
some cases.  You can sit down if you want.

MR. STEWART:  Yes, sir.

THE COURT:  And you probably read these cases, but
these to me are the ones that seem most relevant.  The Seventh
Circuit, *United States v. Ledford*, 218 F.3d 684 in 2000.  And
this was -- obviously was not under the same statute, but in
*Ledford,* the defendants had inflicted bodily injury.  The Court
took testimony -- it was a bank robbery -- and concluded that
both the bank customer and the savings counselor had suffered
bodily injury sufficient to warrant the enhancement.  That is,
the District Court so found and was affirmed.

One of the individuals received medical treatment.  He was
struck in the chest with a firearm, suffered chest pain, had to
be transported to a hospital where he underwent several hours of

tests.

The other individual had bruises, being struck with a gun in the head and rib area, and the District Court concluded that both of them suffered injuries that were painful and obvious and at least one of them required medical attention.  And that was enough for the District Court.

The Court of Appeals deferred to the factual findings and found they were sufficient to sustain the bodily injury enhancement.

And in *United States v. Ranaldson*, a 2010 unpublished opinion by the Fourth Circuit, 386 F. App'x 419, the individual suffered -- the District Court found that the individual suffered significant injury because the punches caused the victim to spit out blood and chip a tooth, in addition to receiving various bumps and bruises.

And the defense argued those were not sufficient.  The Court of Appeals disagreed.

*United States v. Lister*, another unpublished opinion, this one by the Fifth Circuit in 2007, 239 F. App'x 334, bruises, scratches, bumps, pain in the ankle, scratches and bruises on the back and ear, and that the cuts, swelling, and dizziness persisted for several hours and eventually led him to seek medical treatment on two separate occasions, that was sufficient in view of the Court of Appeals.

In *U.S. v. Simpson*, 760 F. App'x 931, again another

unpublished decision, this one by the Eleventh Circuit, the victim underwent a physical examination at the emergency room, X-rays, was given Vicodin, a narcotic pain reliever, and Valium, a muscle relaxer, and was released with a shoulder immobilizer and a prescription for Valium and Ibuprofen.  That was considered enough.

I would suggest that the situation of both *Ranaldson* and *Simpson* were more serious than this one.  *Lister* and *Ledford* I will leave to you to think about.

And then there is *United States v. Mejia-Canales*, Tenth Circuit, a published opinion, 467 F.3d, page 1280, by Judge McConnell, who in his opinion collects the cases, surveys the cases, and says the presentence report said the officer -- this is a 111 case, by the way -- sustained a small laceration on the inside of his mouth and a red mark on his forehead, and under jail policy -- this was within the -- I think he was a prison guard.  The officer was struck twice with his fist, once on the mouth and once on the forehead.

Pursuant to jail policy, he reported to the infirmary, where he was provided with Ibuprofen for his forehead and an oral gel for the cut in his mouth.

The District Court took judicial notice that injuries to the mouth are in and of themselves very painful.  The Court of Appeals found the evidence insufficient to support an enhancement.  Judge McConnell said the relevant sentencing

guideline limits the definition of "bodily injury" to those that are, quote, significant.

It gives as examples, "An injury that is painful and obvious or is of a type for which medical attention ordinarily would be sought.  To be significant, a bodily injury need not interfere completely with the injured person's life, but it cannot be wholly trivial.  While it need not last for months or years, it must last for some meaningful period of time.  It is the actual nature of the injury sustained, and not generalized statements concerning the nature of the conduct, that must be the focus of the District Court's determination of bodily injury.

"In every reported case where a bodily injury enhancement has been upheld against a challenge, the record before the District Court demonstrated injuries that were more severe than those here, were painful and lasting, or were of a type for which medical treatment would ordinarily be sought."

And then he discusses a whole series of cases, including the *Ledford* case which I mentioned before where the enhancement was upheld.  And in a case from the Seventh Circuit where a victim suffered a red welt on his forehead, a shoe print mark on his back, another had bruised arms and a wrenched shoulder that resulted in persistent pain, another with a deep laceration, another with hyperextension of the shoulder.

And in the end -- and then cites some cases in which other

circuits have reversed a District Court's finding, a case called *Dodson,* that had a minimal record and where the officer was not called to testify.

But in the end, Judge McConnell, for a unanimous panel of the Tenth Circuit, says -- concluded that there was no evidence that the injuries were nontrivially painful or lasting and did not find support in the example of an injury for which medical attention would ordinarily be sought, because the injured officer in that case sought treatment as a matter of standard jail practice rather than out of concern over the severity of his injuries.

Anyway, I think I've read enough.  But these are, I think, the key cases.  I assume that counsel has read those and maybe other cases.  But I'm happy to -- now that I've mentioned the case law and now that Mr. Stewart has had his chance to argue, I'm happy to hear further from the government and Mr. Stewart, too, since I've now injected all this case law into the discussion.

MS. IYENGAR:  Your Honor, I guess I wanted to, first of all, respond to a couple of the points that Mr. Stewart had previously made in terms of not -- someone having a headache not being a reason to seek medical attention.

Ordinarily, yes, if it was just a run-of-the-mill headache, I don't think most people would seek medical attention for that. But I think what the -- what's important to the discussion is

1    what the cause of that headache was, and it was that the

2    defendant threw a fire extinguisher at Officer W.Y.'s head, and

3    it struck him in his head while he was wearing a helmet.  That's

4    what the cause of the headache was, and that's the reason that

5    he understandably sought medical attention as a result of the

6    defendant's conduct.

7         So I think we need to be looking at this in the context of

8    what was going on, not just the actual injury to the officer and

9    whether that made it reasonable to seek medical attention.

10        I was trying to take notes as quickly as I could from what

11   the Court was saying in terms of the cases that it was citing.

12   I guess it's -- the case that stood out to me was -- and I

13   wasn't able to write down the case names, but I believe it was

14   the first case that the Court cited.  It was 218 F.3d 684, the

15   case from -- I believe it was from 2000.  That involved the

16   bodily injury that was the result of the victim being struck in

17   the chest with a gun and that that was upheld on appeal.

18        I think that's really the closest comparator to what we

19   have here in terms of facts.  It involves being struck by a

20   metal object, which was exactly what happened to these officers.

21        Frankly, it looks like that victim in that case was struck

22   in the chest, not even in the head, which is a place that a

23   person is much more vulnerable, and ultimately went to the

24   hospital.  He underwent some tests, and it doesn't look like,

25   based upon what the Court indicated, that there was any further

1    treatment that victim was required to undergo, and the

2    enhancement was upheld in that case.

3        So I think this is a case that's really in line with that,

4    because again, while Officer W.Y. didn't need to undergo any

5    further treatment, he did seek treatment, and he had tests run

6    that day as a result of the defendant's conduct.

7        Additionally, I think with respect to Sergeant P.R., who

8    did not have the helmet on, he did have visible bruising and

9    swelling to his head.  He was not wearing a helmet, which made

10   him significantly more vulnerable to being struck in the head

11   with a heavy medical object.  And while he did not go to the

12   hospital, that in and of itself, under that first case that the

13   Court cited, should make the enhancement apply here.

14            THE COURT:  Got it.

15       Mr. Stewart.

16            MR. STEWART:  Yes, Your Honor.

17       I think the first case you discussed was *Ledford*.  Maybe

18   I'm mispronouncing it, but that's what it sounded like to me.

19            THE COURT:  L-e-d-f-o-r-d.

20            MR. STEWART:  Oh.  Well, I got it right.

21       My recollection of that case was that, as you described it,

22   there -- and many of the cases after that are that there were a

23   multitude of injuries, another case blood, another case a broken

24   tooth.  It wasn't until you got to *Mejia-Canales* where we

25   finally had a description of what "significant injury" is and

1    what it isn't.  And I think that's really the focus of our

2    argument.

3         Also, you know, my recollection -- and the government

4    probably has the report handy, but my recollection is that the

5    officer who sustained -- who didn't have the helmet on had a

6    welt.  A welt is considered swelling.  So I think it's important

7    not to describe a single injury in two different ways.  I don't

8    recall that there was bruising.

9         But be that as it may, I think in the other cases that Your

10   Honor described, there was -- there were implements that were

11   being used.  In this case, we agreed that the enhancement for

12   the implement should apply, and that's also one of the

13   components of the 111(b) charge that he pled guilty to for which

14   he received the enhancement -- I hesitate to use the word double

15   enhancement, because this isn't impermissible double counting,

16   but there is the two-level enhancement for the (b) that's

17   included, 111(b) charge, and then also the enhancement for the

18   weapon in this case, or what qualifies as a weapon.

19        So again, this enhancement applies to significant injury,

20   not any and all injuries, and I think that's best described in

21   *Mejia* and what the circumstance in this case is.

22        THE COURT:  Again, as we all know, the guidelines are

23   advisory, not mandatory.  But the Supreme Court and the Courts

24   of Appeal have said that we have to start with the guidelines.

25        So this is an important question.  It's an important legal

1    and factual question that I have to resolve.  So I'm going to

2    take about a ten-minute break, and I will come back and give you

3    my decision on that, and then we can move on to the other issues

4    related to sentencing.

5         (Recess taken from 10:57 a.m. to 11:10 a.m.)

6         THE COURT:  All right.  Is there anything anybody else

7    wants to say on this issue?

8         MR. STEWART:  No, Your Honor.  Thank you.

9         MS. IYENGAR:  No, Your Honor.

10         THE COURT:  Okay.  So not in any way to diminish the

11   seriousness of Mr. Sanford's conduct, which we will discuss more

12   as the morning goes on, I conclude that the government has not

13   carried its burden of proving its entitlement to the

14   enhancement, the three-level enhancement for bodily injury under

15   2A2.2(b)(3)(A).

16         As Mr. Stewart pointed out, bodily injury means any

17   significant injury.  And there were injuries.  The question is

18   whether they were significant.  Examples of significant injuries

19   under 1B1.1 of the guidelines are injuries that are painful and

20   obvious or are of the type for which medical attention

21   ordinarily would be sought.

22         I appreciate the government's proffer, but I must say I was

23   rather surprised that we didn't get either a written victim

24   impact statement or that one or more of the officers weren't

25   here to testify this morning and to provide more detail and

1   answer whatever questions I might have had.

2       The Statement of Facts that was agreed at the time of the

3   plea mentions three officers, but consistently throughout the

4   filing, the focus has been on two, W.Y. and Sergeant P.R.

5       Sergeant P.R. had a bump on his head, swelling on his head.

6   He did not receive medical attention, but the government argues

7   it's the type of injury for which one would normally receive

8   medical attention.

9       W.Y. did have a headache, and he did go to the hospital,

10  from what I understand from what was said this morning.  He

11  finished his tour of duty, and I suspect, based on what I've

12  heard in other cases, that he probably worked many longer

13  hours -- much longer that day than he would in his normal tour

14  of duty.  But he finished his tour of duty, and we all

15  appreciate that, and only went to the hospital after his tour of

16  duty had ended on January 6, and he did not come to work the

17  next day.  He did not need subsequent treatment, and as we

18  discussed earlier, at the emergency room, they did a CT scan and

19  an X-ray, and they sent him home.

20      So the cases that I discussed earlier, it seems to me, not

21  that I'm bound by any of them because I'm making factual

22  findings and reading the guidelines, but in all of them, I

23  think, there was some sort of persistent or lasting injury or

24  some sort of treatment besides precautionary visit or X-rays.

25      In the *Randalson* case, the Court found significant injury

because Randalson's punches caused the victim to spit out blood and chipped a tooth, and in addition, he had bumps and bruises, but spitting out blood and chipping a tooth is certainly more significant.

Simpson went to the hospital, physical exam, X-rays, but then was given Vicodin, Valium, a prescription for Valium and ibuprofen, and a shoulder immobilizer, a shoulder injury of the type for which medical attention ordinarily would be sought and was in fact sought in this case.  That's significant.

In *Lister*, the victim had numerous scratches, bruises, lumps, and bumps after the assault, pain in his ankle, bruises to the back shoulder near the ear, dizziness that persisted for several hours, led him to seek medical treatment on two separate occasions, not on the same day, but it was persistent, because he went back.

In *Ledford*, bank robbery case, one of the bank robbers struck one of the patrons in his chest with his forearm, a fist and gun.  He suffered a contusion on his face, was hospitalized for examination because he complained about chest pains.  As to the other victim, a bank employee, pushed her into the jamb of the vault door, bruises to her arm, her hand, her upper body. Then the bank robber assaulted her twice with the gun.

There was testimony from the witnesses, and after hearing the testimony, and a concession by the defendant, that one of the victims received medical treatment, and in addition, after

1   being struck in the chest with the firearm suffered chest pain

2   and had to be transported to the hospital, was not able to go

3   voluntarily on her own, several hours of tests.

4   And the District Court concluded the injuries were painful

5   and obvious and required medical attention and were significant.

6   In the *Mejia* analysis, the case I read from at length,

7   Judge McConnell in the Tenth Circuit, the Tenth Circuit found

8   the evidence was insufficient to be considered nontrivial and,

9   therefore, significant.  And I won't go over it again, but a

10   deep -- I'm sorry.  The Court could not find that the injuries

11   were, quote, nontrivially painful and could not find that they

12   were lasting and that the officer sought treatment as a standard

13   jail practice rather than out of concern over the severity of

14   his injuries.

15   So I think given the case law, given the proffer that was

16   made, given the lack of testimony or victim impact statements

17   that would have perhaps provided more detail, I don't think the

18   government's met its burden by a preponderance.  So I'm not

19   going to add the enhancement.

20   And if I don't add the enhancement, then just to reiterate,

21   under the guidelines, we start with a base offense level --

22   under 2A2.2, we start with a base offense level of 14.  Because

23   of the use of a dangerous weapon, add 4.  Because the conviction

24   was under 111(b), we add 2.  That's all under 2A2.2.

25   Then under 3A1.2(a) and (b), because the victim was a

government employee and the offense was motivated by the
victim's status and because the -- this was an offense against
persons, add six levels.

That gets me to an offense level 26, with a downward
adjustment of 3 for acceptance of responsibility, offense level
23.

Mr. Sanford has no prior convictions that count toward his
criminal history, which puts him in criminal history category I.

And that means that at an offense level 23, criminal
history category I, the guideline sentencing range is 46 to 57
months.

Obviously, preserving all the arguments and objections
previously made by the government, I will ask counsel if anybody
disagrees with that guideline calculation in view of my findings
on the other issue.

MS. IYENGAR:  No, Your Honor.

MR. STEWART:  No, Your Honor.

THE COURT:  So how do you want to proceed this
morning, now that we have that behind us?

MS. IYENGAR:  Your Honor, we do have one officer here.
It is not either of the two that were the subject of the bodily
injury enhancement.  But we do have Sergeant Gonell, who is with
the United States Capitol Police, who is here.  He was struck in
the face by the traffic cone that the defendant threw, and he
does wish to give a victim impact statement to the Court.  So I

1    wanted to give him an opportunity to speak to the Court.

2              THE COURT:  That doesn't relate to the enhancement

3    issue?

4              MS. IYENGAR:  No, it does not.  This would relate only

5    to our sentencing allocution.

6              THE COURT:  Got it.  Do you think you're going to

7    want -- should we put him on the stand and put him under oath?

8              MS. IYENGAR:  I'm fine with proceeding however the

9    Court --

10             THE COURT:  Mr. Stewart, might you want to ask any

11   questions?

12             MR. STEWART:  I can't -- I don't know.  I don't intend

13   to.

14             THE COURT:  All right.  If you don't know, I guess we

15   better put him on the stand and put him under oath so that if

16   he's, quote unquote, cross-examined, then we will have the

17   normal rules of objections and everything else.

18             MS. IYENGAR:  Excuse me.  Give me one second.

19        Your Honor, I was just speaking with our victim advocate.

20   I believe that because Sergeant Gonell is a victim in this case,

21   the CVRA actually disallows putting him under oath and having

22   him subject to cross-examination.

23        So I think the better course would just be to have him come

24   before the Court and speak.

25             THE COURT:  You are correct.  What's it called?  Crime

1    victim --

2            MS. IYENGAR:  Crime Victims Rights Act.

3            THE COURT:  That's right.  A victim can always speak

4    at sentencing, and we don't have cross-examination as a rule.

5    And similarly, other people can speak at sentencings, including

6    family members and friends of the defendant.

7        Thanks for reminding me of that.  Okay.

8            MS. IYENGAR:  All right.  If you want to come forward.

9            THE COURT:  Sir, good morning.  Would you state your

10   name for the record, and then I'm happy to hear from you.

11           MR. GONELL:  Good morning, Judge.  My name is

12   Sergeant -- former Capitol Police -- and I have to think about

13   that title, because now I'm a former sergeant because of the

14   actions that people like the defendant here --

15           THE COURT:  Okay.  Would you just state your name,

16   please.

17           MR. GONELL:  Sergeant Aquilino Gonell.

18           THE COURT:  Thank you.

19           MR. GONELL:  Thank you.  I apologize if I go too long.

20       When I joined the military, I raised my hand, and I

21   promised to support and defend our great country at any costs.

22   On January 6, 2021, I rose to the occasion once again as a

23   police officer.

24       I have given half of my life to public service.  I'm here

25   today because I wanted to make sure that Mr. Sanford is held

accountable for taking part in the violence of that fateful day.

Mr. Sanford's participation in the mob led to losing the police line that the other officers and I were struggling to maintain and attempting to restore order in the Capitol.  More than 140 officers were injured, as I was, by the mob of insurrectionists that he joined.

After we lost the police line, Mr. Sanford continued his disruptive, violent behavior as I was trying to hold the police line.  He took a cone and threw it toward the officers, hitting me on my head.

Not only was I fighting with multiple rioters in front of me, but I also was getting attacked by other rioters, like Mr. Sanford, throwing common items towards the officers.

His intent was to hurt the officers.  His intent was not to assist the officers.  Many of the officers did not seek medical attention that day like myself because we felt obligated to be there at the Capitol.  We felt compelled that it was our duty to defend the Capitol, despite the injuries like I was.  I had both my hands bleeding out.  I had my foot injured.  I had my shoulder injured.

And the day that I went to -- two days later, I went to the doctor.  The doctor wanted to take me out and put me on restricted duty, and I said no.  I went back, and it was not until January 20th, January 20th, after the inauguration that I sought treatment, despite my injuries.

1    So whatever verbal judo they're trying to make you believe

2    that the officers were not injured enough because they didn't go

3    and seek medical assistance right away, that's a lie, because

4    what we felt was we were compelled, it was our duty to be there

5    to defend the Capitol.

6    If the event of January 6 happened here in this court, if

7    somebody punch you, regardless with the force of the punch, he

8    still punch you.  His intent was to punch you and hurt you.  And

9    I'm sure you want some type of accountability for people coming

10   in this court, attacking your colleagues, attacking you, the

11   institution.

12   That's what the intent was on January 6 on the Capitol,

13   regardless of what they consider minor interaction or caught up

14   in the mob or anything like that.  The intent was there.  It was

15   not because of lack of opportunity or trying that some of these

16   people did not hurt the elected officials and the officers.  It

17   was because of what we did.  Had we, the officers, let those

18   rioters go in the Capitol, all of them, we would have had a

19   blood bath of our elected officials, and our government, system

20   of governance would have ceased to exist.

21   And he was a part of that movement.  Whether by his actions

22   or inactions, he was still impeding officers.  He was still

23   hurting the officers that were trying to hold the line, doing

24   our job.  We were the police officers, not him.  He didn't care

25   about his actions, what he was doing.

1    Today, he's going to be asking you for leniency.  He did

2    not have any leniency toward the officers, towards me on

3    January 6.  He may sound remorseful, but don't buy it.  I don't

4    buy it.  If you give him a second chance, he'll be right back

5    out in those rallies, listening to the former guy, and if he

6    tells them go back to the Capitol, he'll be right back at the

7    Capitol, breaching the nine layers of security that we had set

8    up that day.  And that even the officers who were telling people

9    stop, get back, go back, and they didn't listen; they listened

10   to the former guy.  And if you give him a second chance, he will

11   be right back at it.  There's no doubt in my mind.

12       Had I done what he did, he would still be wearing a neck

13   brace and suing me for damages.  If I had done that as a

14   naturalized citizen, I would be put in jail, pay a fine, and

15   then get my ass deported.

16       It is serious, and I find it very disturbing that some of

17   these people are getting home arrests, probation, or diminishing

18   the severity of what happened on January 6 when you had the next

19   three people in line to the succession of the presidency, the

20   vice president, his family, and the nuclear codes that he

21   carries everywhere he goes or she, the Speaker of the house, the

22   Senate pro tem, and almost 445 elected officials were in that

23   room doing government-mandated function of the transfer of

24   power.  And people like him were intent to stop the process.

25       The 9/11 terrorist attack, that was considered an attempt

to disrupt our government.  Some of those foot soldiers that we
caught in Afghanistan, they're still in jail in Guantanamo
because of what they did, foot soldiers, 20 years later.  Talk
about people like him trying to destroy our system of
government, literally, stopping the process, and he's going to
be here asking you for leniency.  I don't get it.  I don't.

        And he changed lives, the officers'.  Some of those
officers, maybe they don't want to come forward to give their
impact statement because they don't think nothing's going to
change because they see the leniency that some of these rioters,
people who assaulted them that day are getting.  So some of
them, they're like, it's not worth it, it's not worth my time.
I still think that it is worth it.  That's why I'm here today.

        The whole country watched this on live TV.  You may have.
I don't know if you were.  But I lived it, barely.  He was a
part of the mob, and it wasn't because he didn't want -- he did
not want to get in there that he didn't go inside the Capitol.
It was because we stopped him.  It wasn't because of a lack of
opportunity.  Remember his intent.  His intent was to hurt the
officers and stop the government process.

        I'm asking you for the maximum years in prison to deter him
and others from repeating these crimes.  Failure to hold
Mr. Sanford accountable will result in the likelihood of another
January 6, but next time, I won't be there to do what I did to
protect everyone.

1    Downplaying what transpired and not holding -- and not

2    punishing the violent mob for their role, it makes it more

3    likely to recur.  Everything my fellow officers and I sacrificed

4    for will be in vain.

5    We defended the Capitol, not from a foreign entity but from

6    my fellow Americans who attack us.  As an immigrant who loves

7    America, this still shock me.  If the attack was done by another

8    group, we would have had called it a terrorist attack.

9    Mr. Sanford should receive such sentence and connotation

10   for trying to violently overturn our democracy.

11   Thank you.

12           THE COURT:  Thank you very much.

13           MS. IYENGAR:  Your Honor, I'm happy to give my

14   allocution now if the Court is ready for that.

15           THE COURT:  Yes.  Thanks.

16           MS. IYENGAR:  Based upon the new guidelines

17   calculations, the government is asking that the Court sentence

18   the defendant to 57 months, which would be the high end of the

19   new calculation.  And we're also asking for a period of three

20   years of supervised release as well, as well as the restitution

21   that was requested in the government's sentencing memorandum for

22   Officer W.Y. for his medical expenses.

23           THE COURT:  So are we ready to deal with restitution

24   today?  There won't be any further --

25           MS. IYENGAR:  There won't be any further materials

1  provided with respect to that.

2      So I just wanted to go over some of the 3553(a) factors and

3  highlight why a sentence at the high end of the guidelines is

4  appropriate for the defendant's conduct here.

5      The first factor, which is the nature and circumstances of

6  the offense, is a factor that weighs heavily in favor of not

7  just a guideline sentence, but a sentence that's at the top of

8  the guidelines.

9      The defendant's conduct here in a nutshell is that he threw

10  objects into a crowd of officers.  He threw a traffic cone at

11  Sergeant Gonell, as he just described to the court.  He also

12  threw a metal fire extinguisher into a group of officers on the

13  Lower West Terrace immediately after the police line broke, and

14  rioters were able to access the Lower West Terrace.

15      The fire extinguisher landed in the group of officers, and

16  as we've discussed at length, one of the officers was not

17  wearing a helmet.  The fire extinguisher struck him in the head.

18  The second officer was struck in the head while he was wearing a

19  helmet.

20      And I think it's fortunate here that we're talking about

21  whether this even qualifies as bodily injury under the

22  sentencing guidelines and that we're not talking about a much

23  more serious situation, because striking someone in the head

24  with a fire extinguisher could have resulted in a very serious

25  head injury that had permanent ramifications for that particular

1    officer, and it could have resulted in the death of that

2    officer.

3            THE COURT:  Absolutely.

4            MS. IYENGAR:  At the time that the defendant did what

5    he did, he didn't seem to care one way or the other what the

6    outcome of his conduct was, and it didn't appear to matter to

7    him whether the outcome of his conduct was potentially a

8    homicide involving an officer.

9        So I think we need to make sure that we're not diminishing

10   the seriousness of the defendant's conduct here and the

11   potential outcome of what he did.

12       But the other piece of this is not just looking at it kind

13   of in a vacuum of the objects that he was throwing at officers.

14   His conduct was also interfering with the officers' ability to

15   control the crowd that was forming on the Lower West Terrace.

16   The video footage in this case -- and we took some screenshots

17   and put that into the sentencing memorandum that we provided to

18   the Court -- the Court can see that there essentially was a

19   police line that had formed around the Lower West Terrace.

20       The defendant had broken through that police line, and

21   that's when he started throwing those objects into the group of

22   police officers.  That was directly interfering with their

23   ability to control the crowd in that location.

24       So the Court needs to take that into consideration as well

25   when looking at the nature and the circumstances of the offense.

1    The factor relating to the seriousness of the defendant's

2    conduct here, the serious of the offense which the Court is also

3    required to consider under 3553(a), I think it's important --

4    Sergeant Gonell touched on this in his statement -- we're not

5    looking at individual conduct in a vacuum here.  We're looking

6    at essentially a group's conduct.  A mob or a riot can't be

7    caused by just one person.  It's individuals who are coming

8    together to achieve a particular purpose.

9    And in this case, the particular purpose the group was

10   trying to achieve was preventing the peaceful transfer of power.

11   This is no small thing.  This wasn't a group of people rioting

12   because of a sports game or something that was trivial.  They

13   were trying to stop somebody from becoming the next President of

14   the United States.

15   And we need to make sure that we're keeping that in the

16   background of this discussion here.  And it was because of the

17   defendant's participation in that group that the group was able

18   to get very close to achieving its goal.  He was not just

19   physically present there.  He was not just saying things that

20   were inappropriate, calling the police officers that he was

21   interacting with traitors and things of that nature.  But he was

22   also engaging in acts of violence against these officers.

23   And so the seriousness of this offense also weighs heavily

24   in favor of not just again a guideline sentence, but a sentence

25   that is at the top of the guidelines.

And in terms of -- I know an issue that has come up in sentencings across the courthouse with respect to the Capitol riot cases is the issue of unwanted sentencing disparities and avoiding sentencing disparities.  And I know that we cited a few cases for the Court on this issue.

So I just wanted to go through a few of those cases, because I think that they demonstrate that the sentence that we are seeking in this case is appropriate.

I just wanted to point the Court to the *Palmer* case before Judge Chutkan, 21-cr-328.  This was a case where the defendant threw a wood plank at officers and then deployed the contents of a fire extinguisher directly into the tunnel and threw the empty fire extinguisher at a group of officers.

And for that conduct, Judge Chutkan imposed a sentence of 63 months' incarceration, which was within the 63- to 78-month guideline range.

THE COURT:  As I understand it, she did not find the bodily injury enhancement.  So she must have gotten to that guideline in a different way.  Was it a prior conviction, or was it subsequent conduct, or --

MS. IYENGAR:  I believe there was an additional enhancement for a substantive conduct in that case, if my recollection is correct.

THE COURT:  I'll tell you what I think it was.  I actually looked at this.  Is this the one where she didn't -- no

acceptance, or is that the other one?  I think what happened was because of the subsequent conduct, she did not give him the three-level downward adjustment for acceptance of responsibility.  So the subsequent conduct clearly had an impact on her thinking, as it does in many of the cases for all of us.

MS. IYENGAR:  Yes, Your Honor.  So we believe that that's at least a comparative case that can point the Court in the right direction here.

We also wanted to point the Court to a case that was in front of Judge Lamberth, which was *United States v. Devlyn Thompson*.  It was 21-cr-461.  In that case, the guidelines calculation was exactly the same range that we have now, which is 46 to 57 months.  The Court -- Judge Lamberth did impose a guideline sentence at least in that case, which was 46 months of incarceration.

I say all of that to say a downward departure or downward variance from the guidelines we don't believe is appropriate here.  We understand that the guidelines are advisory, but in this particular case, given how serious the defendant's conduct was, the fact that the fire extinguisher that he threw and made contact with officers and how serious it could have been, there is not a reason to vary downward from the guidelines in this particular case.  And I believe that's -- that's all I had in terms of the 3553(a) factors.

With respect to --

```
 1              THE COURT:  Do you want to speak to the question of
 2    deterrence?  As we all know, there is both specific deterrence
 3    with respect to an individual defendant --
 4              MS. IYENGAR:  Sure.
 5              THE COURT:  -- and general deterrence.  Both have a
 6    role to play in these cases.  But the specific deterrence, it
 7    depends on the circumstances.
 8              MS. IYENGAR:  Yes, Your Honor.  I think in terms of
 9    specific deterrence, I understand that the defendant doesn't
10    have a criminal record here.  So we're not looking at a
11    situation where there's a long history of engaging in acts of
12    violence and this is just a part of that long history.  So
13    there's an argument to be made for a specific deterrence with
14    respect to this defendant.
15        But I think what's troubling here is that the defendant
16    went to the rally and subsequently to the Capitol building and
17    again was not just engaging in, you know, like just standing
18    there protesting, something that was more peaceful, or even just
19    yelling statements at officers and things of that nature.  He
20    engaged in an act of violence.
21        And so regardless of his -- the criminal history that he
22    has when he's coming before the Court, there does need to be
23    deterrence for his conduct, both specific and general.
24        And I think with respect to specific deterrence, there is
25    certainly a reason to impose again not just a guidelines
```

sentence but a sentence at the top of the guidelines because of how serious the defendant's conduct is here.  And a sentence of 57 months would have the effect of specific deterrence with respect to this defendant, given how serious his conduct was.

I think when we're talking about general deterrence, there's an even stronger argument to be made, particularly considering how many people were present at the Capitol on that particular day and were engaging in not only property destruction, but assaulting police officers and again generally were trying to prevent the peaceful transfer of power, the Court needs to send a message that this kind of behavior, assaulting police officers, interfering with their ability to do what their job is, to control the crowd and make sure that members of Congress are safe, that the vice president is safe, that that is not acceptable, and varying downward from the guidelines or having a downward departure from the guidelines or even imposing a sentence at the bottom end of the guidelines really sends the message that this just isn't that serious and that the Court doesn't take it seriously.

So that's why we are asking for a sentence at the top end of the guidelines, because that will send that message and have the effect of general deterrence.

THE COURT:  Thank you.

Mr. Stewart.

MR. STEWART:  Thank you.  May it please the Court.

1    I'm ready to present our argument as to sentencing.

2        Other than the objection that Your Honor has already ruled

3    on, we don't have any additional corrections or additions to the

4    presentence report.

5            THE COURT:  I should have asked that question earlier.

6        Does the government?

7            MS. IYENGAR:  No, Your Honor.

8            MR. STEWART:  I apologize, Your Honor.  It's a part of

9    the windup that I have.

10           THE COURT:  No, I'm glad that you raised it.

11           MR. STEWART:  Your Honor, beginning with the 3553(a)

12   factors and the nature and circumstances of the offense, I think

13   that that dovetails with the argument that I made earlier that

14   the way the code is written for 18 U.S.C. 111(a) and (b), along

15   with the guidelines that inform how there should be different

16   enhancements for the offense conduct, creates a spectrum for how

17   these cases should be addressed.

18       In addition to that, it dovetails with the nine factors

19   that the government has identified and suggested to the court

20   are helpful when imposing a sentence on a defendant.  And I

21   listed those factors in -- on page 12 of my position on

22   sentencing.

23       In the case of Mr. Sanford, I think it's important to note

24   that he did not enter the Capitol.  He did not destroy property.

25   He did not destroy evidence.  He did not post on social media

either before or after January 6.  And he was not a member of
any extremist group.  He didn't coordinate with others once he
arrived on the Capitol grounds in an effort to enter the
Capitol.  And he didn't bring or wear any tactical gear, zip
ties, some of the other items that we've seen individuals bring.
He brought a backpack with a first aid kit because he's a
firefighter, was a retired firefighter, and some snacks.

Your Honor, when Mr. Sanford walked to the Capitol with the
others that were in front of him, as I mentioned, when he
arrived at, I guess, that first barrier of what I refer to as
the bicycle rack fences, it was already knocked over.  At least
his recollection was that he didn't see that perimeter
barricade.

In fact, there were already individuals, not just a couple
but there were already individuals engaged with law enforcement
and in the scaffolding.

And there came a time when Mr. Sanford perceived that the
law enforcement response to the crowd and the protestors changed
dramatically.  He certainly had no idea at that point that the
Capitol had been breached.  And if my recollection is right,
that would have happened at 2:11 p.m.  At that point, he
perceives the escalation in the law enforcement efforts to
control the crowd, justifiably control the crowd, and chemical
agents began to be dispersed.  He perceived what were
projectiles coming in from law enforcement.  That's what he

perceived coming in from law enforcement and clearly overreacted
to the way that he was perceiving this law enforcement response.

That's not to provide the Court with any sort of
justification for his actions, only to explain sort of the
context anyway of what was going on in his head but also not
excuse in any way his conduct.

After the offense conduct that I think we've described in
detail previously, law enforcement exited that certain area.  At
that point, many of the defendants that we've seen in these
cases that have been before the Court for sentencing found ways
to re-engage in other places on the Capitol, maybe go to another
entrance, find another place where there was law enforcement.

Mr. Sanford did not do that and, after the incident with
the fire extinguisher and throwing the cone, left the area and
went back to find where his buses were located.  I think that's
another important distinction between some of the other
individuals who were at the Capitol for hours.  We see a number
of defendants who were there until 5:00, 5:30 still roaming
around the grounds, still having not dispersed.

Your Honor, one of the things that has been discussed is
whether or not the statement that Mr. Sanford shares with the
Court will constitute or will be sincere remorse.  And I think
that Mr. Sanford has done a couple of things to try and
demonstrate to the Court and the community that he is truly
remorseful.

1   First, he surrendered to law enforcement within eight days

2   of his -- of January 6.  He was cooperative with law

3   enforcement.  I described that in detail.  After he was

4   surrendered and eventually released, he began engaging in

5   therapy and family therapy to help deal with some of the issues

6   he was experiencing and, probably more importantly, some of the

7   circumstances that he had foisted upon his family to deal with

8   as well and the situation he had put them in.

9   One of the interesting things, I think, also is that

10  Mr. Sanford sought out the counseling or -- I don't know if you

11  would call it treatment, but definitely the counseling of the --

12  the deprogrammer.  And I think the fact that he was willing to

13  sit down and really evaluate, you know, what his thought process

14  was and what brought him to the Capitol on that day and his

15  conduct on that day, I think that that distinguishes him from

16  the vast majority of the other people who arrived before this

17  court for sentencing, and I think it shows a certain sincerity.

18  The other important thing is that unlike many of the

19  individuals, he hasn't been all over social media.  He didn't

20  plead guilty and then get on social media and say "I had my

21  fingers crossed" or whatever sort of sarcastic comments these

22  other defendants have made.  He didn't try to fundraise off it,

23  because he is resolute in his remorse and his contrition for his

24  conduct on that day.

25  Your Honor, Mr. Sanford is a 27-year veteran of the fire

1    department.  He's now retired.  He's the father of three.  He's

2    always been a dedicated father.  Since his retirement, he's been

3    more dedicated, if that's possible.  In speaking with his wife

4    and with Mr. Sanford over the last, I guess, 27 months or so,

5    I've had the opportunity to see that firsthand.  Even during his

6    time of home detention, really, the extent of his travel was for

7    the transportation of his daughter for her medical condition and

8    his son who is a year-round baseball player.  He's very proud of

9    both of his children, and they're actually also both very good

10   athletes.

11          Your Honor, as far -- when it comes to equity, fairness,

12   and deterrence, as the government pointed out, he doesn't have

13   any prior criminal history.  There was a charge that was

14   expunged or nol-prossed 30 years ago.  Since his surrender to

15   custody -- he's either been in custody or really restrictive

16   home confinement for 27 months.  So by my calculation, he's been

17   in custody for approximately eight months, so 19 months of being

18   on GPS with -- I can't remember if it was a 15-mile or a 25-mile

19   radius.  So even with the GPS, he had very restrictive travel.

20          THE COURT:  I think he's actually been in actual

21   custody for about eight months.

22          MR. STEWART:  Right.

23          THE COURT:  Between the initial detention and then

24   after he pled guilty, being detained from that date to this

25   date.

1        MR. STEWART:  Eight months being in actual custody.

2   During that time of actually being in custody, as the Court is

3   familiar, there was approximately two weeks of quarantine when

4   he was just in his cell 24/7 with maybe getting out for hygiene

5   reasons, for an hour here and there, then being transferred to

6   Alexandria for 22 -- and being in his cell for 22 hours and then

7   out for two hours.  And then recently, he was able to start

8   working in Alexandria, receiving time out to help deliver food

9   trays to the -- his fellow inmates and such.

10       But his age, history, and the specifics of this offense I

11  think suggests that it's very unlikely that he will recidivate

12  or be a recidivist.  There's very -- it's much less necessary to

13  specifically deter him.  And the 27 months, eight months of

14  incarceration, 19 months of being on that very restrictive house

15  arrest, certainly is deterrent enough, considering his prior

16  history and circumstances.

17       With regard to general deterrence, Your Honor, I struggle

18  with this.  We've had an election cycle since, and it doesn't

19  necessarily appear that the sentences that -- not this court,

20  but the court generally have given are a deterrent to

21  politicians who still seem very fluent in the rhetoric of

22  violence that led to January 6, and it's concerning.

23       I don't know that general deterrence is going to work on

24  some of the further extreme groups.  But again, Mr. Sanford has

25  worked with an individual specifically to try and address

1    whatever concerns the Court -- that he would have about

2    potentially getting involved in something like this again or

3    going down the proverbial rabbit hole again in order to prevent

4    that.

5         I should qualify, though, when Mr. Sanford was originally

6    arrested, there was a misstatement or a mistake, a mistaken

7    report that he was a member of the Proud Boys or one of these

8    other organizations, and as it turns out, that was completely

9    untrue.  So he doesn't even have any sort of affiliation with

10   one of these groups, like many of the other individuals.

11        With regard to the guidelines, I already discussed the

12   government's nine factors.  Of these nine factors, seven are

13   negative.  One of them involves violence towards law

14   enforcement.  The other two are, I guess, positive, depending

15   upon how the defendant behaves after being charged.  One looks

16   at cooperation.  The other looks at remorse.  And I think

17   Mr. Sanford has satisfied both of those positively.

18        One of the other things I would say is important, one of

19   the themes of my argument, when we're looking at these

20   guidelines, 111 creates these different layers, misdemeanor,

21   felony punishable by eight years, felony punishable by 20 years.

22   Then we have all the various enhancements.  Certainly, it's not

23   impermissible double counting, but certainly, when we look at

24   the enhancement for dangerous weapon, we agreed to this because

25   we felt the fire extinguisher would qualify under this

1    enhancement and it was appropriate.  I think in the spectrum,

2    the fire extinguisher is probably closer to the line.

3              THE COURT:  Closer to the line of what?

4              MR. STEWART:  Potentially not qualify.

5              THE COURT:  As a dangerous weapon?

6              MR. STEWART:  What I'm trying to suggest, Your Honor,

7    is that -- it is a dangerous weapon.  What I'm suggesting is on

8    the spectrum, when you take into consideration other dangerous

9    weapons such as a firearm or a baton, like a metal baton, that

10   on the spectrum, it's closer to --

11             THE COURT:  The case law is very clear, a dangerous

12   weapon can be anything.  It can be the heel of your shoe.  It

13   can be a fountain pen if you stick it in somebody's eye.  Of all

14   people, Mr. Sanford should have known what damage a fire

15   extinguisher could do to another human being if you threw it at

16   them.  He's held -- he's used fire extinguishers his whole

17   career, and he knows better than you and I do that it's heavy,

18   whether it's empty or full, that it's dangerous when thrown at

19   somebody.  It could have been much more serious than it was in

20   this particular case.

21        And, you know, I don't think it's close to the line.  I

22   think anything that anybody picked up there, flag poles, fire

23   extinguishers -- a cone is -- I haven't picked one of them up --

24   I guess I have, in my lifetime, less heavy than a fire

25   extinguisher.  There are all sorts of things that people either

brought with them to the Capitol or picked up at the Capitol or
shields that they wrenched from law enforcement officers and
then used as weapons that were not guns but could cause -- I
mean, a gun can be used as something to hit someone with as well
as something to shoot someone with.

In this case, thank God only one person that day, as far as
we know, was shot and largely because of the restraint of the
Capitol Police officers and the Metropolitan Police officers,
whose hierarchy decided we are not going to start using our
firearms with these insurrectionists, we're going to try other
methods.

But short of shooting somebody with a gun or stabbing
somebody with a knife, anything can be used as a dangerous
weapon.  And I don't think this is minor on the spectrum of
heavy things that can be used to hit, injure another human
being.  And of all people, a person who has been a firefighter
for 27 years should have appreciated that.

MR. STEWART:  And, Your Honor, he certainly did.
Perhaps I was inartful in what I was trying to say.  The point I
was merely trying to point out is even after pleading guilty to
assault on a law enforcement officer with a dangerous weapon,
there's still additional enhancements that go on top of that,
including the enhancement just for pleading guilty to assault on
a law enforcement with a dangerous weapon.

And so we have this spectrum, I guess, that I was trying to

1    point out, not that the -- not that the fire extinguisher

2    wasn't -- didn't warrant that enhancement.  So let me be clear

3    there.  And I apologize for being inartful.

4              THE COURT:  No, I understand.  There are a lot of

5    enhancements in this particular guideline.  You've wisely, I

6    think, avoided arguing double counting.

7              MR. STEWART:  And this is one of the things that you

8    find when you really get into trying to investigate what counts

9    as an enhancement, what doesn't count as an enhancement within

10   this code section and this guideline range.

11       But be that as it may, Your Honor, it is not impermissible

12   double counting, and I think that it's also noteworthy that

13   Mr. Sanford made these stipulations to a lot of these additional

14   enhancements.  It shows the degree to which he accepted

15   responsibility.  And unlike the defendant in one of the cases, I

16   think it was -- well --

17             THE COURT:  She mentioned *Palmer*, and she mentioned --

18             MR. STEWART:  *Thompson*.

19             THE COURT:  -- Judge Lamberth's case.

20             MR. STEWART:  Right.  Well, one of the issues with --

21   I pointed out in my case -- or in my position on sentencing

22   Kevin Creek.  This was a 111(a) case.  That was on page 14 of my

23   position on sentencing.  It's 21-cr-645 with Judge Friedrich.

24   DLF were the initials.

25       And as I mentioned, that individual was charged with only

111(a), and according to the government's position, he brought a knife, mace, radios in case the phones went down.  He broke through the bike rack barrier fence being held by law enforcement.

And then what was really disturbing is that after breaking through the line, he actually chased down two separate law enforcement officers, the first of whom he grabbed, knocked to the ground, and then punched, I guess, in the face shield of his helmet.  Then he chased another law enforcement officer, shoved him to the ground, and then kicked him -- or maybe shoved him on the shoulders, kicked him that caused him to fall to the ground.

And then upon his arrest, he was not remorseful.  And then at sentencing, the arguments that were presented -- I'm trying to think of how to describe this -- really rolled back any acceptance of responsibility in some of the stipulations that were made as far as the guidelines were concerned.

So Mr. Sanford has not done that in this case.  He has --

THE COURT:  Of course, the offense in the case before Judge Friedrich was a 111(a) charge, not a 111(b) charge.

MR. STEWART:  Right.

THE COURT:  And she sentenced him in the middle of the guidelines.

MR. STEWART:  That was 24 months.

And so in that circumstance, I guess you look at some of the factors that the government has, these nine factors that the

government has in other cases suggested are informative of where
a defendant fits on the spectrum.  So you have an individual who
was breaking through a police line, bringing weapons to the
Capitol, chasing down two law enforcement officers and striking
them, and then just a complete lack of remorse at the time of
his arrest and even at the time of his sentencing, to the extent
that the Court had to order the parties to brief various
enhancements prior to the sentencing.

As far as *Palmer* is concerned, you know, there's the wooden
plank that was thrown, fire extinguisher that was discharged and
thrown, then throwing a fire extinguisher a second time, then
going a few minutes later and re-engaging law enforcement with a
pole and throwing it like a spear at officers, and then making
statements while this was all going on, finding time to make
statements to a reporter about his intention to overturn the
election.

And this is all taken out of the -- well, for the most
part, paraphrased from the government's position on sentencing
in the *Palmer* case.  After his guilty plea, he posted a public
statement.

THE COURT:  I think that's why Judge Chutkan did not
give acceptance of responsibility.

MR. STEWART:  Even trying to -- there's two things.
His offense conduct, which I would argue is more serious than
Mr. Sanford's, but then also trying to fundraise and not accept

1   responsibility.

2        Your Honor, based on all of these circumstances and the

3   efforts that Mr. Sanford has taken in order to demonstrate his

4   remorse, we're asking the Court to impose a sentence of 12

5   months and one day, to be followed by an additional 12 months of

6   home confinement -- or home detention, followed by the maximum

7   term of three years of supervised release.

8            THE COURT:  Well, that's not going to happen.  You

9   know that's not going to happen.

10           MR. STEWART:  Thank you, Your Honor.

11           THE COURT:  Ms. Baker, is there anything you want to

12  add on behalf of Probation?

13           PROBATION OFFICER:  Good afternoon, Your Honor.  No.

14           THE COURT:  Thank you.  Anything the government wants

15  to say in response at this point?

16           MS. IYENGAR:  No, Your Honor.

17           THE COURT:  Let's do this.  We've been here a while.

18  I want to get this done, but I want to hear from Mr. Sanford if

19  he would like to speak, and I would be happy to hear from

20  anybody else.

21       Just a moment, sir.

22       And I'd be happy to hear from anybody else if Mr. Stewart

23  wants to call anybody else from the family or friends.

24           MR. STEWART:  Your Honor, I don't have anyone else I

25  would like to call.  I would like to point out that the

reference letters I received on behalf of Mr. Sanford are some

of the most positive, best reference letters I've ever received.

I think they speak to who he is and who he has been in his

community.

THE COURT:  I'll say again that I have read them all,

and I agree with you that family, friends, and colleagues,

former colleagues at the fire department had very positive, very

supportive, and very specific about why.  So I understand that.

MR. STEWART:  Yes, sir.  Thank you.  Shall I remain

next to my client?

THE COURT:  Sure.

THE DEFENDANT:  Your Honor, I would like to extend my

deepest heartfelt apology to the men and women of the Capitol

Police, especially the ones I struck with the fire extinguisher.

My actions that day, totally uncharacteristic of the life I

previously led and the life I am now living.  I want to

apologize to the officer who I called a traitor.  You were just

doing your job that day, and I interfered with that.  Not a day

goes by I don't relive my involvement in that day.

Three words come to my mind over and over:  Embarrassment,

shame, and disgust.  Almost all my life, I was a civil servant,

and I know better.  I spent 26 years serving the citizens of the

City of Chester as a firefighter.  I didn't grow up wanting to

be one.  I was almost 30 years old and not happy with my job,

and my good buddy who was a firefighter in the city and told me

they were giving the test.  I was not sure I was able to do the job.  I took the chance, and it was the best career move I ever made.  I excelled in the Philadelphia Fire Academy.  I came on the job, and I learned from the veterans every day.  The job was dangerous but highly rewarding.  I was proud of my career.

I learned to work as a team not only with my crew but also with the police and officers of the City and State Police.  I gave my all every day I was on the job.

Firefighters, police, EMS are held to higher standards.  I never wanted to tarnish that reputation.  On January 6th, I did.  Not a day goes by that I don't feel ashamed of my actions.  Every firefighter in the country saw what I did that day.  I want to apologize to everyone in emergency service.  Please forgive me.

I want to apologize to my family, my wife, and my children.  This is going on two years now, and we have not had normalcy.  I had just retired, and I was looking forward to having free time, enjoying my family, and then I let this happen.

I know that it's completely my fault that my family is in this situation.  I missed birthdays, holidays, sporting events for my kids, athletics, and vacations.  I'm missing out on so much, and they are missing out on their dad and husband.

My wife and I are a team, and we work together to make our family work.  She's been having to do this on her own, and it's been rough on her.  My daughter has serious migraine issues, and

1    I have not been there to help her out.  We are in regular

2    counseling because of this.  We will get through this.  I love

3    you so much.

4        To my sister, family, and my friends, thank you all so much

5    for being there, my wife, kids -- for taking care of my wife and

6    kids and for making sure they were taken care of and safe.  I'm

7    sorry for all that I put you through.  I love you all.  I am

8    very lucky to have all of these amazing people in my life.

9        I would like one more time to reiterate to the police that

10   I assaulted and the officer that I called a traitor, I am deeply

11   sorry for my actions.  You were just there performing your job.

12   Please forgive me.  I didn't go there that day to do that, Your

13   Honor.  I did not.  Look what I was wearing.  My hat with my

14   name on it and CFD.

15       I'm sorry.  Mob mentality is real, and I was in it.

16           THE COURT:  Say again.

17           THE DEFENDANT:  Mob mentality is real, and I got

18   caught up in it.  And I left immediately after that, and I was

19   ashamed immediately after that.

20           THE COURT:  Anything anybody else wants to say?

21           MS. IYENGAR:  No, Your Honor.

22           THE COURT:  If not, I'm going to make a few comments

23   before I impose sentence.

24       The guideline range is 46 to 57 months.  As I said before,

25   the guidelines are only a guide.  I can go below the guidelines.

In some cases, judges have gone above the guidelines, although I don't think in any of the January 6 cases to date.

Sentencing is always a difficult thing for a judge.  The sentence affects a lot of people.  It affects the defendant, who is incarcerated, clearly.  It affects his family, because their family member is gone and his normal responsibilities in the family and companionship are missing.

And the Court, therefore, is always advised by the sentencing statute to take into account the factors that the government and the defense have cited in their memos, their excellent memos, and in their arguments today.

Sentencing is not a science.  One can never say that X number of months will serve the purposes of sentencing more than Y number of months.  Judges do the best they can in the circumstances.  And the January 6 cases have -- I want to respond in a way to the comments made by the former Capitol Police officer who was here today.

The misdemeanor cases are easier.  Those who are charged with misdemeanors and pled guilty to misdemeanors certainly contributed to the mob mentality, certainly created the mob, certainly enabled what happened to happen.

But we also have a First Amendment in this country, and just because they believe that the election was rigged, just because they believe in Donald Trump, just because a large number of people apparently still do, they can't be punished for

their words and their speech.  They can be punished for their conduct.

And in those cases, the conduct of trespassing and disrupting is on the spectrum, some people more serious than others.  Some people came to hear the speech and then walked into the Capitol for two minutes and turned around and left.  Others contributed to the mob mentality for many, many minutes, sometimes hours, but didn't destroy property and didn't assault anybody.  They were there because of their beliefs.

The cases where people breached the Capitol, broke into the Capitol, broke the police lines, assaulted police officers, destroyed property outside and inside the Capitol and the Rotunda and the Crypt and the offices of various Senators and Congresspersons, they are the more serious ones.

But as was said here this afternoon and has been said in all of these cases, every one of the thousands of people that was there contributed to the mob mentality and to the efforts to stop the lawful functioning of one of our three branches of government, to certify the election of the legitimate president of another of the branches of government.  Every one of them did.

And those that pushed, assaulted, impeded, obstructed -- remember, the statute and the indictment says "forcibly assaulted, resisted, opposes, impeded, intimidated, interfered with," and in the case of Mr. Sanford, forcibly did so with a

1  dangerous weapon, that is, a fire extinguisher.

2      We've all seen still photos of what happened that day.

3  Probably everybody has also seen videos of what happened that

4  day.  I just finished a two-week trial, and I saw a lot of

5  videos of what happened in the West Terrace and people pushing

6  their way into the tunnel and through the tunnel and breaking

7  the entranceway that is not open to the public even in normal

8  times, but an entranceway that's only open to Senators and

9  Congresspersons.

10      Some people watched some of the January 6 hearings.  You

11  couldn't not see some of it.  And I'm not going to punish

12  Mr. Sanford for what other people did.  But to the extent that

13  he was a part of the huge mob of people whom together attempted

14  to do -- to undermine the rule of law and the democratic

15  functioning of the Congress, all of that factors in.

16      And the fact that he used a dangerous weapon and injured at

17  least two but -- we've heard about two in particular, but there

18  was a third as well, and the Statement of Facts said that there

19  was three with the fire extinguisher.

20      And then today I've heard from a former Capitol Police

21  officer who talked about he was not one of the three who was

22  struck with the fire extinguisher, but he was injured that day.

23  The defendant threw one of those orange cones at Officer Gonell,

24  hit him in the head.  And he kept working despite the fact that

25  he was injured from that and from other things that were going

1    on, injuries to his foot and his hand and other things.

2        And there were a lot of officers who were just as committed

3    to their task of preserving the Capitol from those that were

4    trying to interfere with the lawful functioning of the two

5    Houses of Congress that day.

6        With respect to Mr. Sanford, we've -- both counsel have

7    talked about -- we've talked about the injuries, and there were

8    injuries to Officer Gonell, not from the fire extinguisher,

9    based on Mr. Sanford's conduct, and I can consider that.  Even

10   though it is not the dangerous weapon offense to which he pled,

11   it is something that he did on that day, and that goes to the

12   nature and seriousness of the offense and respect for the rule

13   of the law, which are among the factors to be considered.

14       But he did injure two officers, one of whom went to the

15   hospital.  I can't get over the fact, when I think about the

16   nature and circumstances of the offense, that Mr. Sanford spent

17   27 years as a firefighter, and that says two things to me -- it

18   says a lot of things actually.  One goes to the history and

19   characteristics of the defendant.  No prior problems,

20   law-abiding citizen, good family, devoted to his family, devoted

21   to his community, 27 years in a public service job, didn't make

22   a lot of money in the public service job, served his community,

23   helped a lot of people, no doubt.

24       On the other side of the coin is he should have known

25   better than most what these law enforcement officers were facing

that day with this mob.  He should have known better than most.
He took an oath to help his community through putting out fires,
saving people, rescue work, EMS work for 27 years.  These
officers took an oath, too, to serve the community, Metropolitan
Police to serve the citizens of the District of Columbia and all
of the visitors to the District of Columbia, Capitol Police, day
in and day out, to try to protect the Capitol and to protect the
Senators and Congresspersons and staff members.

He should have identified with those officers rather than
attacked those officers, and he knew better than most the
damage, the injury that the heft of a fire extinguisher thrown
from 15 to 20 feet away could do.

The nature and circumstances of the offense are serious.
And another factor is the seriousness of the offense and
promoting the rule of law, the effort to undermine democracy, to
undermine the rule of law, totally inconsistent with everything
Mr. Sanford had done in his professional career and from what
people say in the letters in his personal life.

But that's what he was doing that day.  And he engaged in
acts of violence and injured people as a result of those acts of
violence.

I understand the impact that his incarceration has had and
will have on his family and probably most strikingly on his
17-year-old daughter.  But as I've thought about it -- and
January 6 is different from other cases.  We know that because a

lot of people like Mr. Sanford who had never engaged in criminal activity before did so that day.  But as I always say to drug dealers and bank robbers and other people who come before this court, you should have thought about your family before you committed the crime.  There are hardships, unintended consequences on other people.

His job for 27 years was to protect lives and property, and on this day, he did just the opposite.  There is a serious offense.  The injuries actually could have been much worse if you're hit in the head with a fire extinguisher.

I've looked at the other cases of my colleagues that have been cited to me both by the defense and the prosecution.  Of course, every case is different, and even talking about the ones that are seemingly similar, *Palmer* and *Devlyn Thompson* and Judge Friedrich's case, there are distinctions.

As to deterrence, I certainly agree with what was said earlier today.  There are an awful lot of people in this country who still believe the election was rigged and still might respond to a call from Donald Trump, although not many of them showed up at the Manhattan District Attorney's Office a couple of weeks ago.  We will see what happens around this courthouse or the Justice Department in a few months, I suspect.

I'm not convinced that Mr. Sanford will be among those people if there's another January 6th.  But I do think, despite the fact that an awful lot of people still support Mr. Trump,

1    that there is something to general deterrence in these cases, to

2    sending a message to the country, to the world, maybe some of it

3    will even get through to certain members of Congress, from

4    general deterrence.

5        So those are my thoughts.  And unless anybody else has

6    anything else that they want to say, I am prepared to impose

7    sentence, difficult as it is and always is.

8        Anybody else?

9            MR. STEWART:  No, Your Honor.

10           THE COURT:  Why don't you come up, Mr. Sanford, with

11   Mr. Stewart.

12       Mr. Sanford, pursuant to the Sentencing Reform Act and in

13   consideration of the arguments made today and the factors under

14   the sentencing statute 18 U.S.C. 3553, which we've been

15   discussing all morning, as well as the advisory sentencing

16   guidelines, I'm going to sentence you to the custody of the

17   Bureau of Prisons for a term of 52 months.

18       You will get credit for the approximately eight months

19   you've already been incarcerated.  And you can earn up to 54

20   days a year for good behavior while incarcerated.

21       So 52 months on Count 2.  The government will dismiss the

22   remaining counts.

23       You are further sentenced to serve a 36-month, or

24   three-year, period of supervised release on Count 2 and pay a

25   special assessment of $100.

1    While on supervision, you shall abide by the following

2    mandatory conditions, as well as all of the discretionary

3    conditions recommended by the Probation Office in Part D of the

4    sentencing options in the Presentence Investigation Report.

5    And I assume those discretionary -- so-called discretionary

6    conditions which are set forth in the Presentence Investigation

7    Report at pages 17 and 18, I assume, Mr. Stewart, you and

8    Mr. Sanford have gone over those conditions?

9    MR. STEWART:  We have, Your Honor.

10    THE COURT:  All right.  In that case, under the D.C.

11    Circuit's recent case law, I do not have to read all of those

12    conditions.  Those discretionary conditions are conditions of

13    supervised release once it begins.

14    I will note that Discretionary Condition Number 7 says you

15    have to engage in full-time work.  However, the Probation Office

16    may excuse you from that obligation in view of the fact that

17    you're retired and on a pension.  That's likely to happen, but

18    for now, it's a condition.  You may want to work full-time or

19    part-time.  But you will work that out with Probation in

20    Pennsylvania.

21    The mandatory conditions include you must not commit

22    another federal, state, or local crime.

23    You must not unlawfully possess a controlled substance.

24    You must refrain from any unlawful use of a controlled

25    substance.  You must submit to one drug test within 15 days of

placement on supervision and, at the discretion of Probation, at least two periodic drug tests thereafter.

You must cooperate with the collection of DNA as directed by Probation.

And you must make restitution, and we will talk about that in a moment.

You are ordered to make restitution to the Architect of the Capitol in the amount of $2,000 and to Officer W.Y. in the amount of $3,798 for his medical expenses.

I find that you do not have the ability to pay interest, and therefore, I will waive interest on any penalties that are imposed.

You must pay this penalty in accordance with the scheduled payments and notify the Court of any changes in economic circumstances that might affect your ability to pay.

So I will order -- you can make payments any time you want to, but I will order payments, monthly installments of $75 a month while you're on supervised release beginning one month after you commence supervised release.

You must provide the probation officer access to any requested financial information, authorize the release of such information until your payments are made.  The probation officer may share financial information with the U.S. Attorney's Office.

You must not incur new credit charges or open additional lines of credit without approval of Probation.

1    I'm not going to impose a fine.  I find that you do not

2    have the ability to pay a fine and therefore waive the

3    imposition of a fine.

4    And as I said, I'm already waiving interest payments on the

5    restitution and the special assessment.

6    You must submit to substance abuse treatment and counseling

7    to determine if you've used a prohibited substance, to the

8    extent that Probation thinks it necessary.  You must not attempt

9    to obstruct or tamper with the testing methods.

10   You must participate in a mental health treatment program

11   and follow the rules and regulations of the program.  The

12   probation officer, in consultation with the treatment provider,

13   will supervise your participation in the program.

14   Within 45 days of your release from incarceration -- before

15   I get there, I may have missed something.  I don't see this

16   here, but within 72 hours of your release from incarceration,

17   you must report to the Probation Office within -- in

18   Pennsylvania.

19   Within 45 days of release from incarceration, you will

20   appear before this Court for re-entry -- for a re-entry progress

21   report.  The U.S. Probation Office in the district you are

22   supervised in, which will be in Pennsylvania, will submit a

23   progress report within 30 days of the commencement of

24   supervision, and after receiving that report, I will determine

25   if your appearance is required for this re-entry progress

1  hearing.

2      Restitution will be made to the clerk of this court, as I

3  said $2,000 to the Architect of the Capitol and $3,798 to the

4  victim, W.Y.

5      The Probation Office shall release the Presentence

6  Investigation Report to all appropriate agencies, including the

7  probation office in the approved district of residence in order

8  to execute the sentence of the Court.

9      Another condition of your supervised release is staying

10 away from the Metropolitan D.C. area until your term of

11 supervision is up.

12     Supervision of your supervised release is transferred to

13 the Eastern District of Pennsylvania.  Jurisdiction will be

14 transferred after the re-entry hearing, and I will leave it to

15 Probation to take the necessary steps to make sure that's done.

16     You can appeal your sentence to the Court of Appeals if you

17 believe that your guilty plea was unlawful or involuntary or

18 some defect in those proceedings or these proceedings or if you

19 think that I've imposed an illegal or unconstitutional sentence.

20     You've waived a lot of your rights to appeal.  However, if

21 you wish to appeal, you must do so within 14 days, and if

22 Mr. Stewart thinks that you don't have an issue on appeal or

23 that you've waived certain rights, he still must file a notice

24 of appeal if you ask him to, but it must be done within 14 days.

25     You also have the right to collaterally challenge the

1   conviction entered to the extent permitted by statute, any newly

2   discovered evidence, ineffective assistance of counsel, and

3   similar things.

4        Now, Mr. Stewart, if you want to recommend something with

5   respect to a place of incarceration, you can do that today, or

6   you can communicate with us in the next few days.

7             MR. STEWART:  Your Honor, he would ask the Court to

8   recommend Fort Dix.

9             THE COURT:  Say again.

10            MR. STEWART:  Your Honor, we would ask the Court to

11  recommend Fort Dix.

12            THE COURT:  Fort Dix?  Okay.  I will recommend Fort

13  Dix.

14            MR. STEWART:  Your Honor, the last request.  The

15  letter from Diane Benscoter and then the two letters from the

16  Alexandria Detention Facility staff, if those could be made a

17  part of the PSR so that they're also transferred to the BOP

18  along with that document.

19            THE COURT:  Can we do that?  One is the mental health

20  treater and --

21            PROBATION OFFICER:  Your Honor, I will work with

22  counsel to find out exactly what those documents are, and we

23  will ensure that they are sent as an attachment to the Bureau of

24  Prisons.

25            THE COURT:  One is from his mental health treater, the

1    doctor, and the other two are from D.C. Jail officials --

2              THE DEFENDANT:  Alexandria.

3              MR. STEWART:  I can provide paper copies.

4              THE COURT:  Anything you want to add or that I've

5    forgotten, Ms. Baker?

6              PROBATION OFFICER:  No, Your Honor.

7              THE COURT:  The government wants to make a motion?

8              MS. IYENGAR:  No, Your Honor.  I'm not sure if the

9    Court wanted the government to make a motion with respect to the

10   remaining counts.

11             THE COURT:  To make a motion about the remaining

12   counts.

13             MS. IYENGAR:  We're moving to dismiss the remaining

14   counts of the indictment, then, Your Honor.

15             THE COURT:  They will be dismissed.

16       Does either party have any objections that have not already

17   been noted on the record?

18             MS. IYENGAR:  No, Your Honor, not from the government.

19             MR. STEWART:  No, Your Honor, not from the defense.

20             THE COURT:  All right.  I wish Mr. Sanford the best of

21   luck.  I wish his family the best of luck.

22       Thank you, all, for a long but important morning.

23       (Proceedings adjourned at 12:47 p.m.)

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick                    July 13, 2023

SIGNATURE OF COURT REPORTER         DATE